# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                         No. CR 16-0127 JB

NATHAN ANTHONY PHONGPRASERT,

    Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant Nathan Phongprasert's Motion to Suppress Evidence as a Result of an Unlawful Seizure and Arrest and Memorandum in Support Thereof, filed August 16, 2017 (Doc. 23)("Motion"). The Court held an evidentiary hearing on November 30, 2017. The primary issues are: (i) whether New Mexico State Police Officer William Radasa had reasonable suspicion to stop Defendant Nathan Anthony Phongprasert's vehicle for following another vehicle too closely; (ii) whether Radasa's Vehicle Identification Number ("VIN") inspection of Phongprasert's vehicle violated the Fourth Amendment of the Constitution of the United States of America; and (iii) whether Phongprasert validly consented to Radasa's and New Mexico State Police Officer Ruben Aguirre's search of Phongprasert's vehicle. The Court concludes that: (i) Radasa had reasonable suspicion to stop Phongprasert's vehicle for following another vehicle too closely; (ii) Radasa's VIN inspection of Phongprasert's vehicle did not violate the Fourth Amendment; and (iii) Phongprasert validly consented to Radasa's and Aguirre's vehicle search. Accordingly, the Court will deny the Motion.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to a search. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Merritt, 695 F.2d at 1269 ("The purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments. In this type of hearing the judge had latitude to receive it, notwithstanding the hearsay rule."); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)[1]("We need not resolve whether Crawford [v. Washington, 541

---

[1] United States v. Garcia is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to

U.S. 36 (2004)]'s[2] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'"); United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)(unpublished)("It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant. The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings."). Cf. United States v. Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to detention hearings").

    1.    Radasa has worked as a New Mexico State Police Officer for four years. See Draft Transcript of Evidentiary Hearing at 3:14-16 (taken November 30, 2017)(Han, Radasa)("Tr.").[3]

    2.    On December 10, 2015, at approximately 11:00 a.m., Radasa was driving his police car on Interstate 40 ("I-40") heading eastbound near the 133 mile marker in Bernalillo County, New Mexico, near Albuquerque. See Tr. at 3:17-23 (Han, Radasa).

---

a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266 (10th Cir. 2005). The Court concludes that United States v. Garcia, United States v. Ramirez, 388 F. App'x 807 (10th Cir. 2010)(unpublished), and United States v. King, 209 F. App'x 760 (10th Cir. 2006)(unpublished) have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[2]Crawford v. Washington holds that testimonial hearsay is inadmissible at a criminal trial when offered against a defendant unless the hearsay declarant is unavailable and the defendant had a previous opportunity to cross examine the declarant. See 541 U.S. at 53-54.

[3]The Court's citations to the evidentiary hearing's transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

3.      Aguirre accompanied Radasa in Radasa's vehicle.  <u>See</u> Tr. at 16:5-9 (Han, Radasa).

4.      Earlier that day, Radasa had run the license plates of Arizona and Wisconsin drivers that he had encountered through the New Mexico State Police's system.  <u>See</u> Tr. at 34:1-21 (Johnson, Radasa); New Mexico State Police Unit Log at 1 (dated July 10, 2017)(Defendant's Hearing Exhibit AA)("Dispatch Log").

5.      Radasa saw a black SUV, which Phongprasert was driving.  <u>See</u> Tr. at 3:24-4:1 (Han, Radasa).

6.      Phongprasert's vehicle was traveling at approximately sixty-five miles per hour. <u>See</u> Tr. at 39:20-22 (Radasa, Johnson).

7.      The average length of the white stripes painted on the highway in the traffic stop's vicinity is 10.5 feet, and the average distance between the stripes is 28.5 feet.  <u>See</u> Photograph of Highway at 1 (undated)(Defendant's Hearing Exhibit A); Tr. at 61:2-7 (Johnson, Torres)(Torres explaining his calculations).[4]

8.      Phongprasert's vehicle is approximately seventeen feet long.  <u>See</u> Tr. at 64:10-11 (Torres).

9.      Before Radasa stopped Phongprasert, Phongprasert was driving behind a commercial truck and traveling at a minimum of seventy-eight to eighty-three feet, or 4.7 car lengths, <u>see</u> Tr. at 70:19-24 (Johnson, Torres)(Torres explaining his calculations); Photograph of Highway at 1 (undated)(Defendant's Hearing Exhibit T), and a maximum of 145.5 feet, or 8.5

---

[4]Raymond Torres, Phongprasert's expert, is a retired police officer who now works as a private investigator and accident reconstructionist.  <u>See</u> Tr. at 55:3-6 (Torres).  Torres visited the site of Phongprasert's traffic stop and measured the lengths of the white stripes on the highway, and the distances between them, in the traffic stop's vicinity.  <u>See</u> Tr. at 59:10-19 (Johnson, Torres).

car lengths, see Tr. at 65:21-24 (Johnson, Torres)(Torres explaining his calculations); Photograph of Highway at 1 (undated)(Defendant's Hearing Exhibit B), behind it.

10.    It would have taken the commercial truck driving in front of Phongprasert an average of 269 feet to come to a complete stop when traveling at 65 miles per hour, or 229 feet when traveling at 60 miles per hour.  See Tr. at 77:2-17 (Johnson, Torres)(Torres explaining his calculations).

11.    Had the truck slammed on its brakes, Phongprasert was traveling far enough behind the truck that he would have had a sufficient distance to stop, and would not have collided with the truck.  See Tr. at 78:10-21 (Torres, Johnson)(Torres explaining his calculations).

12.    When driving on a highway, a police officer cannot analyze frame by frame the distance between two vehicles, nor would an officer know the lengths of different car models. See Tr. at 79:20-25 (Han, Torres); id. at 80:1-10 (Han, Torres).

13.    The distance between Phongprasert's vehicle and the truck fluctuated, and the vehicles were traveling at approximately sixty-five miles per hour.  See Tr. at 80:11-20 (Han, Torres).

14.    Radasa believed that Phongprasert's vehicle was following the commercial truck too closely.  See Tr. at 4:1-2 (Radasa).

15.    Radasa estimated that Phongprasert's vehicle was fewer than five car lengths behind the truck.  See Dash Camera Video of Officer William Radasa at 9:40-9:50 (dated December 10, 2015)(Government's Hearing Exhibit 2)("Video").[5]

_____

[5]During this part of the Video, Radasa "informed Mr. Phongprasert that the proper distance between vehicles is 5-7 car lengths and he would be issuing Mr. Phongprasert a warning citation for following too closely."  Motion at 2.  See Video at 9:40-9:50.  From this information,

16. Radasa uses a "five second rule" to determine if he believes a vehicle is following another vehicle too closely. Tr. at 4:23-25 (Radasa).

17. This rule involves observing a vehicle pass a stationary object, counting off five seconds, and then observing whether the following vehicle passes the stationary object within the five-second interval. See Tr. at 5:3-12 (Radasa).

18. The New Mexico Driver's Manual advises that drivers should use a "three second rule" which, except for the time interval, operates the same way as Radasa's "five second rule." Tr. at 26:16-19 (Johnson, Radasa).

19. Radasa knows that the New Mexico Driver's Manual advises a "three second rule." Tr. at 26:16-19 (Johnson, Radasa).

20. Radasa knows that federal standards require that the white stripes painted on an interstate highway be approximately eleven feet long, and the distance between the white stripes be approximately twenty-eight to thirty feet. See Tr. 30:1-7 (Johnson, Radasa).

21. Radasa ran Phongprasert's California license plate through the New Mexico State Police's system. See Tr. at 34:22-24 (Johnson, Radasa); Dispatch Log at 1.

22. Radasa initiated a traffic stop and pulled over Phongprasert's vehicle to the side of I-40. See Tr. at 5:15-16 (Han, Radasa).

23. Radasa walked to the passenger side of Phongprasert's vehicle, and asked for Phongprasert's driver's license, vehicle registration, and proof of insurance. See Tr. at 6:5-8 (Radasa).

24. Radasa observed that Phongprasert would not look at him directly, that his hands were shaky, and that he appeared nervous. See Tr. at 6:11-14 (Radasa).

---

the Court can infer that Radasa believed that Phongprasert's vehicle was less than five car lengths behind the truck.

25.     Radasa smelled a strong odor of air freshener, but did not observe any air fresheners in plain sight.  <u>See</u> Tr. at 6:19-22 (Radasa).

26.      After Radasa received the requested documents from Phongprasert, Radasa asked him to exit the vehicle and follow him to the passenger side of Radasa's police car.  <u>See</u> Tr. at 6:24-7:1 (Radasa).

27.     Radasa then began to draft a citation for Phongprasert for following the commercial truck too closely.  <u>See</u> Tr. at 7:2-5 (Han, Radasa); <u>id.</u> at 21:19-22 (Han, Radasa).

28.     Radasa asked Phongprasert about his travel plans, and Phongprasert told him that he was driving from California to Oklahoma.  <u>See</u> Tr. at 8:4-9 (Radasa).

29.     It usually takes eight to twelve minutes for Radasa to issue a citation.  <u>See</u> Tr. at 8:17-19 (Radasa).

30.     In his career, Radasa has issued hundreds of citations for following another vehicle too closely.  <u>See</u> Tr. at 25:2-4 (Johnson, Radasa).

31.     It took approximately eight minutes for Radasa to issue Phongprasert's citation. <u>See</u> Video at 02:48-11:06.

32.     Radasa also checked Phongprasert's vehicle's VIN.  <u>See</u> Tr. at 9:1 (Radasa).

33.     When Radasa checked the VIN, he first opened the vehicle's driver's side door. <u>See</u> Video at 8:38-8:40.

34.     He then looked toward the bottom right part of the door frame to check the VIN sticker.  <u>See</u> Video at 08:39-08:44.

35.     Radasa then briefly moved closer to the vehicle's doorway before stepping back and closing the door.  <u>See</u> Video at 8:45-849.

36. During the VIN inspection, Radasa's back and hat remain visible in the Video, and are outside the doorway. See Video at 8:45-849.

37. During the VIN inspection, Radasa looked briefly into Phongprasert's vehicle. See Video at 8:46-8:50.

38. Apart from seeing the VIN, there is no evidence in the record indicating what Radasa saw during the VIN inspection, including during this brief look.

39. Radasa remained physically outside of Phongprasert's vehicle when he inspected the VIN inside the doorjamb. See Video at 8:38-8:49.

40. After checking the VIN inside the door, Radasa checked the VIN on the vehicle's dash. See Tr. at 45:7-9 (Johnson, Radasa).

41. During the VIN check, Phongprasert stood on the passenger side of Radasa's police car. See Tr. at 10:5-6 (Radasa).

42. After checking the VIN, Radasa walked back to his police car and finished issuing the citation. See Tr. at 10:9-10 (Radasa).

43. Radasa told Phongprasert that, in his opinion, a safe distance to travel behind another vehicle is between five and seven car lengths. See Tr. at 30:23-31:1 (Johnson, Radasa).

44. After Radasa issued the citation, he told Phongprasert that Phongprasert was free to leave. See Tr. at 11:1-6 (Han, Radasa).

45. Radasa returned Phongprasert's vehicle registration, driver's license, and proof of insurance to Phongprasert. See Tr. at 11:7-11 (Han, Radasa).

46. Phongprasert understood that he was free to leave, because he then walked away from Radasa and toward his own vehicle. See Tr. at 11:12-21 (Han, Radasa).

47.     As Phongprasert walked toward his vehicle, Radasa called out to him "Sir!"  Tr. at 11:24 (Radasa).

48.     Phongprasert turned and walked toward Radasa.  See Tr. at 12:1-3 (Radasa).

49.     Radasa then stated that he knew he had said that Phongprasert was free to leave, but inquired whether he could ask Phongprasert more questions.  See Tr. at 45:16-18 (Johnson, Radasa).

50.     Phongprasert replied that Radasa could ask him more questions.  See Tr. at 12:6-8 (Han, Radasa)("[H]e advised that I could ask more questions.").

51.     During this exchange, Radasa's tone was not commanding.  See Video at 11:00-11:30.

52.     During this exchange, there is no evidence in the record that the officers displayed their weapons, physically touched Phongprasert, or used intimidating body language.

53.     Radasa asked Phongprasert if Phongprasert had anything illegal in his car.  See Tr. at 46:5-8 (Johnson, Radasa).

54.     Radasa then asked Phongprasert if he could search Phongprasert's vehicle.  See Tr. at 46:9-10 (Johnson, Radasa).

55.     Phongprasert verbally agreed to allow the search.  See Tr. at 13:20-14:1 (Han, Radasa).

56.     Radasa also showed and explained to Phongprasert the New Mexico Department of Public Safety Consent to Search Form.  See New Mexico Department of Public Safety Consent to Search Form at 1 (dated December 10, 2015)(Government's Hearing Exhibit 1)("Consent Form"); Tr. at 14:4-9 (Radasa).

57.     Phongprasert completed and signed the Consent Form.  <u>See</u> Tr. at 14:4-9 (Radasa); Consent Form at 1.

58.     Phongprasert read the form, and Radasa watched him read it.  <u>See</u> Tr. at 14:18-25 (Han, Radasa).

59.     The Consent Form states:

> I, Nathan Phongprasert, hereby grant my consent to William Radasa Officer[] of the New Mexico Department of Public Safety, to search the following vehicle described below including luggage, containers, and contents therein.  If [the] search reveals a false or altered compartment, access to such compartment will be made by any means available, including drilling and/or cutting of compartments
>
> . . . .
>
> I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form.  I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

Consent Form at 1 (alterations added).

60.     During the time that Phongprasert read and signed the Consent Form, Radasa did not un-holster his weapon, try to intimidate Phongprasert into signing the Consent Form, physically box him into any location, or command him to sign.  <u>See</u> Tr. at 15:6-22 (Han, Radasa).

61.     Radasa spoke to Phongprasert loud enough to be heard over the I-40 traffic but did not raise his voice further.  <u>See</u> Tr. 15:17-20 (Han, Radasa).

62.     Phongprasert never said that he did not understand the Consent Form.  <u>See</u> Tr. at 15:23-25 (Han, Radasa).

63.     Phongprasert never said that he changed his mind about, or withdrew his consent to, the vehicle search.  <u>See</u> Tr. at 16:1-4 (Han, Radasa).

64.     Nothing in the record indicates that Phongprasert ever wanted or attempted to revoke his consent to the vehicle search.

65.     Aguirre, who accompanied Radasa during the traffic stop, never tried to intimidate or force Phongprasert to sign the Consent Form. See Tr. at 16:13-16 (Han, Radasa).

66.     Aguirre asked Phongprasert if he read and understood the Consent Form, and Phongprasert said that he read and understood it. See Tr. at 22:20-23:7 (Han, Radasa).

67.     Radasa and Aguirre told Phongprasert to stand about fifteen feet away from Phongprasert's vehicle, and to stay there, while they searched it. See Tr. at 48:23-49:2 (Johnson, Radasa).

68.     Radasa told Phongprasert that, if he needed anything, he could yell at the officers. See Tr. at 48:18-20 (Johnson, Radasa).

69.     Radasa never told Phongprasert that if Phongprasert wanted the officers to stop searching, he could revoke his consent. See Tr. at 48:21-25 (Johnson, Radasa).

70.     The search revealed a hidden compartment containing methamphetamine. See United States's Response to Motion to Suppress Evidence at 2-3, filed September 13, 2017 (Doc. 31)("Response").

**PROCEDURAL BACKGROUND**

On January 14, 2016, a federal Grand Jury indicted Phongprasert for one count of "unlawfully, knowingly and intentionally possess[ing] with intent to distribute a controlled substance, 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine." Indictment at 1, filed January 14, 2016 (Doc. 2)("Indictment"). The Indictment alleges that such actions are "in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)." Indictment at 1. Phongprasert filed the Motion on August 16, 2017. See Motion at 1.

1.    **The Motion.**

Phongprasert first argues that Radasa had no probable cause or reasonable suspicion to initiate the traffic stop, and that the stop was pretextual.  <u>See</u> Motion at 4.  Phongprasert contends that he was not violating any traffic laws when Radasa stopped him.  <u>See</u> Motion at 4.  Phongprasert argues that, according to the New Mexico Driver's Manual, one is not following another vehicle too closely if he or she maintains a three-second interval behind the preceding vehicle, which he asserts he did.  <u>See</u> Motion at 6.  According to Phongprasert, Radasa and Aguirre did not understand New Mexico's "following too closely" statute, N.M. Stat. Ann. § 66-7-318, because Phongprasert was driving consistent with the New Mexico Driver's Manual's "three-second rule," and because he was driving approximately five to seven car lengths behind the commercial truck.  Motion at 9.

Phongprasert next contends that Radasa's VIN inspection resulted in an unlawful search.  <u>See</u> Motion at 9.  Specifically, Phongprasert avers that Radasa unnecessarily delayed the traffic stop by inspecting Phongprasert's vehicle's doorjamb VIN.  <u>See</u> Motion at 9.  According to Phongprasert,

> "where the dashboard VIN plate was readable from outside the passenger compartment, that VIN matches the VIN listed on the registration, and there are no signs the plate has been tampered with, there is insufficient cause for an officer to extend the scope of a detention by entering a vehicle's passenger compartment for the purpose of further examining any VIN."

Motion at 10 (quoting <u>United States v. Caro</u>, 248 F.3d 1240, 1246 (10th Cir. 2001)).

Finally, Phongprasert argues that his consent to the vehicle search was invalid, because the officers denied him the right to revoke consent.  <u>See</u> Motion at 11.  Phongprasert argues that, "even if a suspect gives consent to officers to search an otherwise protected area, the suspect retains the right to withdraw that consent."  Motion at 12 (citing <u>United States v. Alcantar</u>, 271

F.3d 731, 738 (8th Cir. 2001)).  According to Phongprasert, because the officers did not tell him that he had a right to revoke his consent to the vehicle search, and because the officers told him to stand away from the vehicle while they searched it, "he was denied his right to revoke any consent to search."  Motion at 12.  Phongprasert concludes that the Court should suppress the evidence seized from the vehicle search.  <u>See</u> Motion at 13.

**2.**     **The Response.**

The United States responds to the Motion.  <u>See</u> Response at 1.  The United States first argues that the officers had reasonable suspicion that Phongprasert was following the commercial truck too closely.  <u>See</u> Response at 3.  According to the United States, "'a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'"  Response at 3 (quoting <u>United States v. Botero-Ospina</u>, 71 F.3d 783, 787 (10th Cir. 1995)).  According to the United States, the officers believed that Phongprasert was following the commercial truck more closely than was "reasonable and prudent" in light of the traffic conditions, so they had reasonable suspicion that a traffic violation occurred.  Response at 5 (quoting N.M. Stat. Ann. § 66-7-318(A)).

The United States next argues that Radasa's VIN inspection did not violate Phongprasert's rights under the Fourth Amendment.  <u>See</u> Response at 7.  According to the United States, "'neither of the VIN's two locations -- either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile -- is subject to a reasonable expectation of privacy.'"  Response at 7 (quoting <u>United States v. Ramos</u>, 194 F. Supp. 3d 1134, 1157-58 (D.N.M. 2016)(Browning, J.)).  The United States therefore contends

that "neither the VIN inspection itself nor the method of the inspection presents any problematic Fourth Amendment issues." Response at 8.

The United States next argues that Phongprasert's consent to the vehicle search was voluntary. See Response at 9. The United States contends that Radasa returned Phongprasert's driver's license, registration, and proof of insurance, told Phongprasert that he was free to leave, and never displayed an overbearing show of authority when he asked Phongprasert additional questions. See Response at 9. The United States concludes that, on these facts, "the encounter was consensual at this point, and Defendant provided consent to search voluntarily." Response at 9.

Finally, the United States avers that, "in the event that the traffic stop did not become a consensual encounter, the extension of the traffic stop would still be justified because the officers had the reasonable suspicion necessary to continue the detention." Response at 11. The United States contends that Radasa noticed a strong odor of air freshener when he initially pulled over Phongprasert, but saw no air fresheners; that Phongprasert was nervous; and that the car showed no signs of hard travel. See Response at 11. According to the United States, these facts and others "were sufficient to extend the detention." Response at 11. The United States concludes that the Court should deny the Motion. See Response at 12.

3. **The Reply**.

Phongprasert replies to the Response. See Defendant's Reply to the Government's Response to Defendant's Motion to Suppress Fruits of Traffic Stop at 1, filed September 26, 2017 (Doc. 32)("Reply"). Phongprasert first argues that Radasa and Aguirre did not have reasonable suspicion that Phongprasert was violating a traffic law, because Phongprasert was driving more than four car lengths behind the commercial truck. See Reply at 2. In the

alternative, Phongprasert contends that, even if the officers made a mistake, such a mistake was unreasonable, because Phongprasert was driving between four and seven car lengths behind the commercial truck at all times.  See Reply at 3.

Phongprasert next avers that his purported consent to the vehicle search was invalid.  See Reply at 4.  According to Phongprasert, "'it is well established that, under the fruits of the poisonous tree doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was purged of the primary taint.'"  Reply at 5 (quoting United States v. Washington, 490 F.3d 765, 774 (9th Cir. 2007)).  Phongprasert contends that, because the initial traffic stop violated the Fourth Amendment, and because there was no attenuation between the traffic stop and Phongprasert's purported consent to the search, the purported consent was invalid.  See Reply at 6.

Finally, Phongprasert asserts that the officers did not have reasonable suspicion to extend the traffic stop.  See Reply at 7.  According to Phongprasert, "an officer needs reasonable suspicion or consent to commence a post-citation encounter," and, here, the officers had neither reasonable suspicion nor consent.  Reply at 8.  Phongprasert contends that signs of nervousness and odors of air freshener do not justify prolonged detention, because they do not give rise to reasonable suspicion.  See Reply at 8-9.  Phongprasert concludes that the Court should grant the Motion.  See Reply at 11.

4.  **The Hearing.**

The Court held an evidentiary hearing on November 30, 2017.  See Tr. at 1:11-14 (Court).  The parties spent the majority of the hearing presenting the evidence described above.  See Findings of Fact ("FOF") ¶¶ 1-70, at 3-11.  After the parties finished introducing evidence,

Phongprasert argued that any mistake which the officers may have made in initiating the traffic stop was unreasonable, see Tr. at 85:10-16 (Johnson), because "at no time had that commercial motor vehicle stopped would [he] have collided with that motor vehicle," Tr. at 87:7-10 (Johnson). Phongprasert added that nothing supports Radasa's "five second rule" and that such a rule is not in the New Mexico Driver's Manual. Tr. at 87:24-88:1 (Johnson). Instead, according to Phongprasert, the New Mexico Driver's Manual uses a "three second rule." Tr. at 88:24 (Johnson). Phongprasert contended that Radasa arbitrarily picked a five-second rule that the law does not support. See Tr. at 89:18-19 (Johnson).

Phongprasert next argued that the traffic stop was pretextual. See Tr. at 90:19-20 (Johnson). Phongprasert contended that the officers ran several out-of-state license plates through the police system on the day of Phongprasert's traffic stop, which, Phongprasert averred, shows pretext. See Tr. at 90:23-91:10 (Johnson). Phongprasert then asserted that, in any event, Phongprasert's consent to the vehicle search was not knowing and voluntary, because the officers told him to stand fifteen feet away from the vehicle and implied that he had to stay there while they searched his vehicle. See Tr. at 99:9-23 (Johnson). Regarding the VIN search, Phongprasert contended that Radasa's doorjamb inspection before checking the VIN on the car's dash was unlawful. See Tr. at 102:1-8 (Johnson). Phongprasert concluded that Radasa had no reasonable suspicion to initiate the traffic stop. See Tr. at 106:11-13 (Johnson).

The United States then took the podium and argued that Radasa had reasonable suspicion to think that Phongprasert was following the commercial truck too closely and that any mistake was reasonable "given the fact that this was happening at [a] high rate of speed on a busy highway." Tr. at 108:18-25 (Han). Regarding pretext, the United States asserted that "the subjective intent of officers is not a factor." Tr. at 110:19-20 (Han). Regarding the VIN

inspection, the United States asserted that, if the police can see the "VIN from the outside and it matches the registration and there is no sign of tampering, then you cannot enter a vehicle's passenger compartment . . . but [the police can] still look at the doorjamb." Tr. at 111:25-112:4 (Han)(alteration added). At the hearing's conclusion, the Court stated that it was inclined to deny the Motion. See Tr. at 116:3-4 (Court).

**5.** __The Supplemental Memorandum.__

After the hearing, Phongprasert submitted the Defendant's Supplemental Memorandum Brief in Support of Defendant's Motion to Suppress Evidence, filed December 1, 2017 (Doc. 49)("Supp. Mem."). Phongprasert first asserts that Radasa had no reasonable suspicion to initiate the traffic stop. See Supp. Mem. at 2. According to Phongprasert, "Radasa's hunch that Mr. Phongprasert was following too closely and the officer's conjecture about this contrived 'five second' rule simply is insufficient to establish reasonable suspicion that criminal activity was afoot." Supp. Mem. at 3. More specifically, Phongprasert contends that Radasa's decision to stop Phongprasert was unreasonable for a number of reasons, including that Phongprasert was driving at least 4.7 car lengths behind the commercial truck, that Radasa knew the lengths of the white highway stripes and the distances between them, that Radasa's five-second rule is arbitrary, and that Phongprasert could have stopped safely had the commercial truck suddenly stopped. See Supp. Mem. at 4-5.

Phongprasert next asserts that Radasa's actions during the VIN inspection were unreasonable. See Supp. Mem. at 7. According to Phongprasert, "the video shows Officer Radasa peering into the driver's side of the vehicle, appearing to visually search the vehicle but not check the doorjamb for a VIN. This intrusion was not justified and resulted in a violation of Mr. Phongprasert's Fourth Amendment rights." Supp. Mem. at 8. Phongprasert adds that

"opening the driver's side door and partially entering the driver's compartment with his upper body is not permissible under the Fourth Amendment."  Supp. Mem. at 8.

Finally, Phongprasert argues that, "under the totality of the circumstances, failure to advise Defendant he could revoke consent was unreasonable and invalidated any purported consent given."  Supp. Mem. at 8.  According to Phongprasert, the totality of the circumstances show that his consent to the vehicle search was involuntary, because he was standing on the side of I-40 with two police officers, the officers did not tell him that he could revoke his consent, and the officers told him to stand fifteen feet away from his vehicle while they searched it.  See Supp. Mem. at 10.  Phongprasert adds that "ordering Mr. Phongprasert to remain at least 15 feet from his vehicle and to essentially not return to the vehicle was a form of deceit because Mr. Phongprasert was free to return to his car, revoke consent and depart."  Supp. Mem. at 10.  Phongprasert concludes that the Court should grant the Motion.  See Supp. Mem. at 11.

>        **6.**        **The Supplemental Response.**

The United States briefly responds to the Supp. Mem.  See United States's Response to Defendant's Supplemental Brief at 1, filed December 11, 2017 (Doc. 50)("Supp. Response").  Regarding Radasa's VIN inspection, the United States argues that "so long as the officer does not enter the passenger compartment s/he is free to check both VINs."  Supp. Response at 2.  The United States asserts that Radasa "certainly did not reach into the passenger compartment or move items around.  Instead, he remained outside the car at all times and checked the VIN in the doorjamb, as he is lawfully allowed to do."  Supp. Response at 2.  The United States then briefly re-asserts Radasa had reasonable suspicion to pull over Phongprasert, see Supp. Response at 3-4, and adds that it was "standard procedure" for the officers to tell Phongprasert to stand away from the vehicle while they searched it, Supp. Response at 4.

## RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)). "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)). The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

1.    **Reasonable Government Searches.**

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable. Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)). "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121 (citing, as an e.g. cite, Terry v. Ohio, 392 U.S. 1 (1968)("Terry")). The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118). See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the

degree to which it is needed for the promotion of legitimate governmental interests'" (quoting

United States v. Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the
> constitutionality of a governmental search is "reasonableness."  At least in a
> case . . . where there was no clear practice, either approving or disapproving the
> type of search at issue, at the time the constitutional provision was enacted,
> whether a particular search meets the reasonableness standard "'is judged by
> balancing its intrusion on the individual's Fourth Amendment interests against its
> promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor

Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of

reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of
> precise definition or mechanical application.  In each case [determining
> reasonableness] requires a balancing of the need for the particular search against
> the invasion of personal rights that the search entails.  Courts must consider the
> scope of the particular intrusion, the manner in which it is conducted, the
> justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- the United

States Court of Appeals for the Tenth Circuit and other courts look to the individual's privacy

expectations.  See, e.g., United States v. Knights, 534 U.S. at 119-20 (noting that the petitioner

had a "significantly diminished . . . reasonable expectation of privacy," because a condition of

his probation was to consent to search of his apartment without notice or probable cause, and

because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d

at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited

expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the

fourth amendment for a person on conditional release, or a felon, may be unreasonable for the

general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining

and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions." Florida v. Jardines, 133 S. Ct. 1409, 1419 (2013)(Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)). Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority, noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." 515 U.S. at 654 (internal citations omitted). See Apodaca v. New Mexico Adult Probation and Parole, 998 F. Supp. 2d 1160, 1186 (D.N.M. 2014)(Browning, J.); United States v. Alabi, 943 F. Supp. 2d 1201, 1251-52 (D.N.M. 2013)(Browning, J.).

2.      **Traffic Stops.**

A traffic stop is an investigative detention, see United States v. Toro–Pelaez, 107 F.3d 819, 823-24 (10th Cir. 1997), and is thus analyzed according to the principles that the Supreme Court set forth in Terry, see United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir. 2011)(concluding that a traffic stop is a Terry stop); United States v. Leon–Quijada, 107 F.3d 786, 792 (10th Cir. 1997). In Terry, the Supreme Court authorized police officers to conduct limited seizures and to search a person's outer clothing when the officer has reasonable suspicion that criminal activity may be afoot. See Terry, 392 U.S. at 30-31. The Tenth Circuit has

concluded that traffic stops fall into the category of Terry stops. See United States v. Toro–Pelaez, 107 F.3d at 823-24 ("A traffic stop is a seizure within the meaning of the Fourth Amendment[, but] it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause."). See United States v. Sedillo, No. CR 08-1419, 2010 WL 965743, at *10 (D.N.M. Feb. 19, 2010)(Browning, J.); United States v. Hanrahan, No. CR 04-1978, 2005 WL 2312746, at *4 (D.N.M. Aug. 12, 2005)(Browning, J.), aff'd, 508 F.3d 962 (10th Cir. 2007).

For officers to lawfully stop a vehicle, they must have "a particularized and objective basis for suspecting the particular persons stopped of criminal activity." United States v. Leos–Quijada, 107 F.3d at 792 (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Police officers may stop a vehicle only when they have "a reasonable, articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity." United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995)(citing United States v. Nicholson, 983 F.2d 983, 987 (10th Cir. 1993)). Reasonable suspicion is not determined by any one factor, but by the totality of the circumstances that the officer knew. See United States v. Ceballos, 2009 WL 4642368, at *2-3 (10th Cir. 2009)(unpublished); United State v. Elkins, 70 F.3d at 83 (citing Alabama v. White, 496 U.S. 325, 330 (1990)). Even if the officer does not form subjective reasonable suspicion, if the circumstances of which he is aware would lead an officer to develop reasonable suspicion, the stop is proper. See United States v. Ceballos, 2009 WL 4642368, at *2 (holding that an officer's "subjective characterization of his actions is irrelevant").

If a police officer observes a traffic violation, the officer has cause to execute a traffic stop. See Whren v. United States, 517 U.S. 806, 809-10 (1996)("As a general matter, the

decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); United States v. Ramstad, 308 F.3d 1139, 1144 & n. 1 (10th Cir. 2002)(acknowledging that Whren v. United States "indicate[s] that probable cause is a *sufficient* ground for a stop," but explaining that reasonable suspicion is all that is necessary) (quoting United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001)).  Even if the officer has an ulterior motive for executing the traffic stop -- i.e., to investigate some other suspected illegal conduct -- the officer can lawfully pull over a vehicle that he or she observes violating the traffic laws.  See Whren v. United States, 517 U.S. at 813-14; United States v. King, 209 F. App'x 760, 762 (10th Cir. 2006)(unpublished)("The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved.")(citing Whren v. United States).  In other words, there is no constitutional prohibition on what are colloquially referred to as "pretext stops," so long as the officer also had a constitutional basis for executing the stop. United States v. Sedillo, 2010 WL 965743, at *10.

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 135 S. Ct. 1609 (2015).  See Knowles v. Iowa, 525 U.S. 113, 117 (1998)(observing that the investigation into the traffic offense is "a relatively brief encounter" that is "more analogous to a so-called '*Terry* stop' . . . than to a formal arrest" (quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984))).  The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' -- to address the traffic violation that warranted the stop, . . . and attend to related safety concerns."  Rodriguez v. United States, 135 S. Ct. at 1614.  Because the officer's purpose is to address the traffic infraction, the stop may last no longer than is necessary to effectuate that purpose.  See Illinois v. Caballes, 543 U.S. 405, 407 (2005).  The authority for the seizure therefore ends when the officer completes -- "or reasonably

should have [] completed" -- the tasks tied to the traffic infraction.  Rodriguez v. United States, 135 S. Ct. at 1614.  See United States v. Hunnicutt, 135 F.3d 1345 (10th Cir. 1998)(observing that the traffic stop must last no longer than necessary to confirm or deny the suspicion that justified the stop -- the traffic offense).  In short, absent reasonable suspicion to justify an extended detention, an officer cannot "measurably extend" the stop beyond the time reasonably necessary to complete his traffic-related inquiries.  United States v. Rodriguez, 135 S. Ct. 1609, 1615 (2015).

Beyond writing the traffic citation, an officer's mission includes "ordinary inquiries incident to [the traffic] stop."  Illinois v. Caballes, 543 U.S. at 408.  Typically, these inquiries involve checking the driver's license, registration, and proof of insurance, as well as determining whether any outstanding warrants for the driver exist.  See Delaware v. Prouse, 440 U.S. 648, 658-60 (1979).  These checks serve the same purpose as the traffic code: to ensure that vehicles on the road are operated safely and responsibly.  See Delaware v. Prouse, 440 U.S. at 658-59; 4 W. LaFave, Search and Seizure § 9.3(c), 507-517 (5th ed. 2012).  Similarly, a VIN inspection confirms that the driver can legally operate this particular vehicle -- because it is not stolen -- on the highway.  See New York v. Class, 457 U.S. 106, 115 (1986)(concluding that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop").  The Supreme Court has held VIN searches "constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officer's observed respondent commit two traffic violations."  New York v. Class, 457 U.S. at 119; id. at 114 ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile.").  Unlike license and insurance, however, checking the VIN located inside of

the vehicle's doorjamb requires opening the vehicle's door. Nonetheless, the Supreme Court has stated that neither of the VIN's two locations -- "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile . . . is subject to a reasonable expectation of privacy." New York v. Class, 475 U.S. at 118. Checking a vehicle's VIN therefore has a similarly close connection to roadway safety as the ordinary inquiries, so it can fairly be characterized as part of the officer's traffic mission.

Recently, the Court held that a police officer's VIN inspection and questioning did not unlawfully extend a Terry stop. See United States v. Ramos, 194 F. Supp. 3d 1134, 1163 (D.N.M. 2016)(Browning, J.), aff'd 2018 WL 1074296, at *7 (10th Cir. 2018). The Court reasoned that, "like license and registration, checking the VIN is related to a traffic stop's mission, and [the police officer] did not need reasonable suspicion that the car was stolen to inspect the VIN." United States v. Ramos, 194 F. Supp. 3d at 1165 (alteration added). The Tenth Circuit affirmed, concluding that "although it cannot be determined from the appellate record whether the traffic stop involved a Fourth Amendment violation, we affirm the district court's denial of the motion to suppress based on the attenuation doctrine." United States v. Ramos, No. 17-2013, 2018 WL 1074296, at *1 (10th Cir. 2018).

Officers may also engage in routine questioning while conducting the traffic stop, but "only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" Rodriguez v. United States, 135 S. Ct. at 1614 (quoting Arizona v. Johnson, 555 U.S. 323, 327-28 (2009)). See Muehler v. Mena, 544 U.S. 93, 101 (2005)(noting that, because unrelated inquiries did not "exten[d] the time [the petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was required"). Accordingly, an officer may conduct certain unrelated checks during a lawful traffic stop, but "he may not do so in a way that prolongs the

stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez v. United States, 135 S. Ct. at 1615.

In Rodriguez v. United States, the Supreme Court held that a "seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." 135 S. Ct. at 1612 (alterations in original)(internal quotation marks omitted). There, a police officer issued a driver a traffic warning, and returned to the driver and to the passenger all of their documents. See 135 S. Ct. at 1613. After "the justification for the traffic stop was 'out of the way,'" the officer, without permission from the driver: (i) instructed the driver to turn off the ignition, exit the vehicle, and stand by the patrol car; and (ii) deployed a K-9 to circle the vehicle twice to sniff for drugs. 135 S. Ct. at 1613. "[S]even or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs." 135 S. Ct. at 1613. The Supreme Court rejected the United States Court of Appeals for the Eighth Circuit's conclusion that the seven- or eight-minute delay constituted an acceptable "*de minimis* intrusion on Rodriguez's personal liberty." 135 S. Ct. at 1614. The Supreme Court concluded that the dog sniff, if performed without reasonable suspicion, measurably extended the detention and noted that the officer's authority to detain the driver "end[ed] when tasks tied to the traffic infraction are -- or reasonably should have been -- completed." Rodriguez v. United States, 135 S. Ct. at 1614. See United States v. Sharpe, 470 U.S. 675, 686 (1985)(stating that, in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation"); United States v. Torres, No. CR 16-4138, 2017 WL 3149395, at *19 (D.N.M. 2017)(Browning, J.).

3. **Vehicle Searches.**

While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro–Pelaez, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search."). Under the automobile-exception to the warrant requirement, however, a warrant is generally not required. See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999); United States v. Burgess, 576 F.3d 1078, 1087 (10th Cir. 2009)(citing California v. Acevedo, 500 U.S. 565, 580 (1991)). The ongoing exigent circumstance that the vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle. See Maryland v. Dyson, 527 U.S. at 466-67 ("[W]here there [is] probable cause to search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.")(citing United States v. Ross, 456 U.S. 798, 809 (1982))(internal quotes omitted); California v. Carney, 471 U.S. 386, 393-94 (1985). Thus, as long as the investigating officer has probable cause to believe that the vehicle contains contraband or evidence of criminality, he or she may search the vehicle without a search warrant. See United States v. Sedillo, 2010 WL 965743, at *11; United States v. Torres, 2017 WL 3149395, at *19.

4. **Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search warrant and probable-cause requirements. See Schneckloth v. Bustamonte,

412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government (i) "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."  United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."  United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, 2010 WL 965743, at *12 (some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).  The inquiry is an objective one.  See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003).  "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave,

such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances. For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary. See Schneckloth v. Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way." United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted). Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." United States v. Drayton, 536 U.S. at 205. As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words. "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so

long as they are sufficiently comprehensible to a reasonable officer." United States v. Guerrero, 472 F.3d 784, 789-90 (10th Cir. 2007). See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'"). For example, in United States v. Ringold, 335 F.3d 1168 (10th Cir. 2003), the Tenth Circuit held that an affirmative nod was sufficient to constitute consent. See 335 F.3d at 1175.

In United States v. Gordon, 173 F.3d 761 (10th Cir. 1999), the suspect moved to suppress all physical evidence an officer seized from a locked duffle bag. See 173 F.3d at 765. The officer then asked to see the suspect-train passenger's ticket and identification, inquired into his travel plans, and asked if he had any luggage. See 173 F.3d at 765. The officer did not inform the suspect that he was free to leave or not to answer her questions. See 173 F.3d at 765. The officer asked to search the suspect's luggage and the suspect gave his consent. See 173 F.3d at 765. She asked him whether he had any contraband, informing him that contraband was the subject of her search. See 173 F.3d at 765. When she encountered the suspect's locked bag, she asked him if he could open it. See 173 F.3d at 765. Although the suspect did not respond verbally, he "removed the key from his pocket and handed it to [the officer]." 173 F.3d at 766. The Tenth Circuit concluded that the suspect's "voluntary relinquishment of the key evidenced his consent to search the locked duffle bag." 173 F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his luggage. See 173 F.3d at 766. The ultimate issue in determining the scope of consent is what a reasonable person would have understood the suspect's consent to include. See United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995). The Tenth Circuit determines whether a search

remains within the boundaries of the consent given based on the totality of the circumstances. See United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996). The Tenth Circuit has "consistently and repeatedly" held that, when an officer tells a suspect the object of his search and the suspect consents to a search for that object within a certain area, the suspect thereby consents to a search of any area within the confines of the officer's request where the object may be found. United States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs, he consented to a search of any area in the motel room where one might hide drugs"). See United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that the search did not exceed the scope of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in searching the entire vehicle"); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding that the removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed the scope of consent to search the car); United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the defendant consented to a search of his apartment for another person, he consented to the search of any area large enough to accommodate that individual).

Notably, if the suspect fails to object to the officer's search, it indicates that "the search was within the scope of consent." United States v. Gordon, 173 F.3d at 766. See United States v. Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics). Accordingly, in United States

v. Gordon, the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked bag when the officer discovered it within his larger bags. 173 F.3d at 766 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")). The Tenth Circuit emphasized: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." 173 F.3d at 766.

## RELEVANT LAW REGARDING THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's rights under the Fourth or Fifth Amendments to the Constitution of the United States of America, the government will generally be prohibited from using that evidence in a criminal prosecution against that person. See Sanchez–Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process.")(internal citations omitted); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment, and a causal nexus between the violation and the evidence sought to be excluded. See United States v. Torres–Castro, 470 F.3d 992, 999 (10th Cir. 2006). Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies. See

United States v. Torres–Castro, 470 F.3d at 999.  The Supreme Court has recognized several exceptions to the exclusionary rule.  See United States v. Alabi, 943 F. Supp. 2d at 1255.

One such exception is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 136 S. Ct. 2056, 2016 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)).  "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence."  Utah v. Strieff, 136 S. Ct. at 2061.  To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence, courts examine the three factors that the Supreme Court articulated in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search.  Brown v. Illinois, 422 U.S. at 603.  This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained.  Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam).  The Supreme Court has previously concluded that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval, and, therefore, counseled in favor of suppressing the evidence.  Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances."  Brown v. Illinois, 422 U.S. at 603-04.  The Supreme Court found sufficient intervening circumstances to admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applied the

independent source doctrine.  See 468 U.S. at 799-801, 814.  There, agents had probable cause to believe that apartment occupants were dealing cocaine.  See 468 U.S. at 799-800.  They sought a warrant.  See 468 U.S. at 799-800.  In the meantime, they entered the apartment, arrested the occupant, and discovered evidence of drug activity during their security sweep.  See 468 U.S. at 800-01.  The next evening, they obtained a search warrant.  See 468 U.S. at 800-01.  The Supreme Court deemed the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant was "wholly unconnected with the entry and was known to the agents well before the initial entry."  468 U.S. at 814.  The Supreme Court suggested that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'"  Utah v. Strieff, 136 S. Ct. at 2062 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Court examines "the purpose and flagrancy of the official misconduct."  Brown v. Illinois, 422 U.S. at 604.  See Utah v. Strieff, 136 S. Ct. at 2062 (observing that the third factor is particularly significant).  The exclusionary rule exists to deter police misconduct.  See Davis v. United States, 564 U.S. 229, 236-37 (2011).  The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant."  Utah v. Strieff, 136 S. Ct. at 2063.  Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation."  Utah v. Strieff, 136 S. Ct. at 2063.  See United States v. Torres, 2017 WL 3149395, at *23.

## ANALYSIS

The Court concludes that Radasa validly initiated the traffic stop, because he had reasonable suspicion that Phongprasert was violating a traffic law.  Further, Radasa's VIN

inspection of Phongprasert's vehicle did not result in an unlawful search.  Finally, Phongprasert validly consented to Radasa's and Aguirre's vehicle search, because Phongprasert voluntarily signed a consent-to-search form.  Accordingly, the Court will deny the Motion.

## I. RADASA HAD REASONABLE SUSPICION TO STOP PHONGPRASERT'S VEHICLE.

The Court concludes that Radasa had reasonable suspicion to stop Phongprasert's vehicle for following another vehicle too closely.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "A traffic stop for a suspected violation of law is a 'seizure'" within the Fourth Amendment's meaning.  Heien v. North Carolina, 135 S. Ct. 530, 536 (2014)("Heien").  "[T]o justify this type of seizure, officers need only 'reasonable suspicion' -- that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law."  Heien, 135 S. Ct. at 536 (quoting Navarette v. California, 134 S. Ct. 1683, 1687-88 (2014)).  The Supreme Court has held that reasonable suspicion may be based on either a reasonable mistake of law or fact, explaining that "[r]easonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground."  Heien, 135 S. Ct. at 536. Importantly, however, "[t]he Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes -- whether of fact or of law -- must be *objectively* reasonable.  We do not examine the subjective understanding of the particular officer involved."  Heien, 135 S. Ct. at 539 (emphasis in original).

"In determining whether reasonable suspicion exists, we look at the totality of the circumstances."  United States v. Conner, 699 F.3d 1225, 1228 (10th Cir. 2012).  "[R]easonable suspicion may exist even where it is more likely than not that the individual is *not* involved in

any illegality. Reasonable suspicion requires only some minimal level of objective justification." United States v. Conner, 699 F.3d at 1228 (emphasis in original)(internal citations and quotations omitted).

Here, Radasa had reasonable suspicion to believe that Phongprasert was following the commercial truck too closely. See N.M. Stat. Ann. § 66-7-318(A). Radasa saw Phongprasert driving behind a commercial truck, the distance between Phongprasert's vehicle and the truck fluctuated, and the vehicles were traveling at approximately sixty-five miles per hour. See Tr. at 80:11-20 (Han, Torres); FOF ¶ 13, at 5. When driving on a highway, a police officer cannot analyze frame by frame the distance between two vehicles, nor would an officer know the lengths of different car models. See Tr. at 79:20-25 (Han, Torres); id. at 80:1-10 (Han, Torres); FOF ¶ 12, at 5. Radasa estimated, however, that Phongprasert's vehicle was less than five car lengths behind the truck. See Video at 9:40-9:50; FOF ¶ 15, at 5.[6] Indeed, there was at least one interval, according to Phongprasert's own expert, when Phongprasert was traveling seventy-eight to eighty-three feet, or 4.7 car lengths behind the truck. See Tr. at 70:19-24 (Johnson, Torres)(Torres explaining his calculations); Photograph of Highway at 1 (undated)(Defendant's Hearing Exhibit T); FOF ¶ 9, at 4. Given the vehicles' speeds and the fluctuating distance between them, under "the totality of the circumstances," United States v. Conner, 699 F.3d at 1228, Radasa had "some minimal level of objective justification," United States v. Conner, 699 F.3d at 1228, to believe that Phongprasert was following the truck "more closely than is reasonable and prudent, having due regard for the speed of such vehicles," N.M. Stat. Ann. § 66-

---

[6]During this part of the Video, Radasa "informed Mr. Phongprasert that the proper distance between vehicles is 5-7 car lengths and he would be issuing Mr. Phongprasert a warning citation for following too closely." Motion at 2. See Video at 9:40-9:50. From this information, the Court can infer that Radasa believed that Phongprasert's vehicle was less than five car lengths behind the truck.

7-318(A). Radasa thus had reasonable suspicion to stop Phongprasert for following the truck too closely.

### A.    AT MOST, RADASA MADE A REASONABLE MISTAKE OF FACT.

Even if, however, Radasa's estimate was wrong, and Phongprasert never got less than five car lengths behind the truck, Radasa would still have reasonable suspicion, because he would have made a reasonable factual mistake regarding the distance between the vehicles. Under such circumstances, the Court would still conclude that the traffic stop was valid. During the encounter, there were intervals when Phongprasert was traveling farther away from the truck than Radasa realized, but there were also intervals when Radasa correctly estimated the distance between the two vehicles. Radasa believed that Phongprasert's vehicle was less than five car lengths behind the truck. See Video at 9:40-9:50; FOF ¶ 15, at 5. After the fact, Phongprasert's expert showed that Phongprasert was traveling at a minimum of seventy-eight to eighty-three feet, or 4.7 car lengths, see Tr. at 70:19-24 (Johnson, Torres)(Torres explaining his calculations); Photograph of Highway at 1 (undated)(Defendant's Hearing Exhibit T), and a maximum of 145.5 feet, or 8.5 car lengths, see Tr. at 65:21-24 (Johnson, Torres)(Torres explaining his calculations); Photograph of Highway at 1 (undated)(Defendant's Hearing Exhibit B), behind the commercial truck, see FOF ¶ 9, at 4-5. In other words, Radasa correctly believed that Phongprasert was traveling less than five car lengths behind the truck at least part of the time. Thus, both Radasa and Phongprasert agree that, at times, Phongprasert was traveling less than five car lengths behind the truck. See Video at 9:40-9:50; FOF ¶ 15, at 5; Tr. at 70:19-24; FOF ¶ 9, at 4-5.

In addition, there were also intervals when Phongprasert was traveling five to seven car lengths behind the truck, a greater distance than Radasa believed, and the distance that Radasa

later told Phongprasert was proper.  See Video at 9:40-9:50; Motion at 2; FOF ¶ 15, at 5.  That

Radasa's estimation of the vehicles' distances was not always correct, however, creates, at most,

an objectively reasonable factual mistake, because a police officer driving down a highway

cannot reasonably be expected to analyze the distance between two vehicles with precision like

an expert can.  See Tr. at 79:20-25 (Han, Torres); id. at 80:1-10 (Han, Torres); FOF ¶ 12, at 5.

An objectively reasonable factual mistake does not defeat reasonable suspicion.  See Heien, 135

S. Ct. at 536.  Further, that there was at least one interval, according to Phongprasert's own

expert, when Phongprasert was traveling 4.7 car lengths behind the truck, see Tr. at 70:19-24

(Johnson, Torres)(Torres explaining his calculations); Photograph of Highway at 1

(undated)(Defendant's Hearing Exhibit T); FOF ¶ 9, at 4, strengthens the Court's conclusion that

Radasa had "some minimal level of objective justification," United States v. Conner, 699 F.3d at

1228, to believe that Phongprasert was following the truck "more closely than is reasonable and

prudent," N.M. Stat. Ann. § 66-7-318(A).  This conclusion is further warranted, because

"reasonable suspicion may exist even where it is more likely than not that the individual is *not*

involved in any illegality." United States v. Conner, 699 F.3d at 1228 (emphasis in

original)(internal citations and quotations omitted).

     **B.     RADASA DID NOT MAKE A MISTAKE OF LAW.**

     Phongprasert argues that Radasa misconstrued the New Mexico traffic law at issue,

asserting that "Radasa's five second rule[7] is not supported by statute or followed by the New

---

       [7]As explained above, Radasa uses a "five second rule" to determine if he believes a vehicle is following another vehicle too closely.  Tr. at 4:23-25 (Radasa); FOF ¶ 16, at 6.  This rule involves observing a vehicle pass a stationary object, counting off five seconds, and then observing whether the following vehicle passes the stationary object within the five-second interval.  See Tr. at 5:3-12 (Radasa); FOF ¶ 17, at 6.

Mexico Driver's Manual."[8]  Supp. Mem. at 3.  Although Radasa's five second rule is not found

in a statute, it is still a permissible tool for officers to use.  Under New Mexico law, "[t]he driver

of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent,

having due regard for the speed of such vehicles and the traffic upon and the condition of the

highway."  N.M. Stat. Ann. § 66-7-318(A).  The phrase "reasonable and prudent" has no

concrete definition; rather, it is an intentionally flexible all-things-considered standard.  The

Court of Appeals of New Mexico has held that

> the ability to explain reasonable and prudent following distance in terms of
> seconds, car lengths, a variable ratio between speed and distance, or even the
> likelihood that the followed driver will be offended . . . simply reinforces the
> point. . . . Section 66-7-318's use of the terms "reasonable" and "prudent"
> acknowledges the uncontroversial notion that lawful and safe driving may depend
> on context, and thus a certain measure of flexibility is necessary to ensure public
> safety and uniform enforcement of traffic rules.

State v. Sanchez, No. 34,170, 2016 WL 1546619, at *3 (N.M. Ct. App. 2016)(Hanisee, J.).  The

Court of Appeals of New Mexico further explains the common-sense notion that,

> [i]f a highway is icy, then a reasonable and prudent distance might be several
> hundred feet.  Conversely, tailing another car by a few yards may be reasonable
> and prudent in the parking lot of a sports arena.  Section 66-7 [-] 318(A)'s
> mention of the speed of the followed driver and the condition of the roadway thus
> reinforces our conclusion that an ordinary driver will intuitively understand what
> a reasonable and prudent following distance is in a given situation.

---

[8]The New Mexico Driver's Manual advises that drivers should use a "three second rule"
which, except for the time interval, operates the same way as Radasa's "five second rule."  Tr. at
26:16-19 (Johnson, Radasa).  See FOF ¶ 18, at 6.  At the evidentiary hearing, the Court stated
that it vaguely remembered that, when it took driver's education in high school in the early
1970s in Hobbs, New Mexico, it was told to count one second or to stay one car length behind
the car in front of it for every ten miles per hour, and that heuristic was how to avoid traveling
behind another vehicle too closely.  See Tr. at 88:11-17 (Court).  In other words, if one is
traveling sixty-five miles per hour, one should stay at least 6.5 seconds or car lengths behind the
next vehicle.  Phongprasert replied that he did not find what the Court was referencing, but that
the New Mexico Driver's Manual advised the three-second rule.  See Tr. at 88:21-24 (Johnson).

State v. Sanchez, 2016 WL 1546619, at *2.  Given the statute's intentional flexibility, no hard-and-fast rule like Radasa's five-second rule, the New Mexico Driver's Manual's three-second rule, or one based on car lengths or miles per hour is a correct interpretation of the statute.  But those rules are not statutory interpretations, and so they cannot be mistakes of law.  Instead, they are helpful heuristics in determining whether a particular driver is following another more closely than is reasonable and prudent.

The Court of Appeals of New Mexico has permitted such heuristics. It held that, when an officer saw the defendant "driving a single car length behind a motorcycle while traveling twenty-five miles per hour," this information was sufficient to support reasonable suspicion. State v. Sanchez, 2016 WL 1546619, at *4.  Importantly, the Court of Appeals of New Mexico did not say that using such a heuristic constituted a mistake of law.

As a more detailed example, Tennessee has a law similar to New Mexico's, stating that a driver "shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Tenn. Code. Ann. § 55-8-124(a).  The Tennessee Comprehensive Driver's License Manual ("Tennessee Driver's Manual") once stated that vehicles should maintain a one car length interval for every ten miles per hour of speed, see United States v. Collazo, 818 F.3d 247, 255 (6th Cir. 2016), similar to what the Court learned in Hobbs, see Tr. at 88:11-17 (Court).  The Tennessee Driver's Manual was later revised to say that, while traveling at higher speeds on a highway, vehicles should use a four-second rule, which operates the same way as the three and five-second rules discussed in this case.  See United States v. Collazo, 818 F.3d at 255.  The United States Court of Appeals for the Sixth Circuit explained that it uses the Tennessee Driver's Manual -- meaning the car-length rule and the four-second rule -- "for guidance in applying the

reasonable and prudent standard." <u>United States v. Collazo</u>, 818 F.3d at 255 (internal quotation marks omitted). The Sixth Circuit held, however, that

> [t]his court's persistent invocation of the Manual for guidance does not mean that a driver traveling at highway speeds necessarily violates Tenn. Code Ann. § 55-8-124(a) by breaking the car-length rule or the four-second rule. Drivers, after all, are statutorily bound to comply with the language of § 55-8-124(a), not with the language of the Manual.

<u>United States v. Collazo</u>, 818 F.3d at 255. "Accordingly, although neither of these rules constitutes an authoritative determination of what a reasonable and prudent following distance is, the rules operate as valuable guideposts when determining whether an officer possessed probable cause to stop a vehicle for violating § 55-8-124(a)." <u>United States v. Collazo</u>, 818 F.3d at 255-56 (internal quotation marks omitted). In other words, rules like the four-second rule, or Radasa's five-second rule, are not interpretations of law, and so employing them cannot create a mistake of law, despite Phongprasert's contentions. <u>See</u> Supp. Mem. at 3. Rather, those rules are helpful heuristics in determining whether a driver's following distance is reasonable and prudent. For these reasons, Radasa's use of the five second rule is not a mistake of law.[9]

Even if, however, Radasa did not use his five-second rule as a heuristic for applying the statute's reasonable and prudent requirement and instead interpreted the statute to impose a rule requiring a five-second gap while traveling at sixty-five miles per hour on the highway, Radasa

---

[9]To be clear, the Court is not giving the police free reign to make up rules for traffic law enforcement. If, for example, a police officer were to contend that he used a thirty-second rule in determining whether a driver's following distance was reasonable and prudent, and initiated traffic stops on that basis, the Court's response would not be that a thirty-second rule was a mistake of law. Rather, the Court would hold that a thirty-second rule gives no indication whether a driver's following distance is reasonable and prudent, the officer therefore had no "minimal level of objective justification," <u>United States v. Conner</u>, 699 F.3d at 1228, and thus no reasonable suspicion to initiate such a traffic stop. In this way, allowing for heuristics like Radasa's five-second rule does not mean that the Court is allowing the police to make up traffic law enforcement rules.

would have made a reasonable mistake of law.  "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistake on the part of government officials, giving them fair leeway for enforcing the law in the community's protection."  Heien, 135 S. Ct. at 536 (internal quotation marks omitted).  "The limit is that the mistakes must be those of reasonable men."  Heien, 135 S. Ct. at 536 (internal quotation marks omitted).  Reasonable people could fairly conclude that the phrase "reasonable and prudent" means staying five seconds away from the previous vehicle while driving down a highway at sixty-five miles per hour.  Additionally, rules like the three or five-second rule, or the rule that the Court learned in Hobbs in the 1970s, see Tr. at 88:11-17 (Court), are used to prevent drivers from crashing into other vehicles, which is the obvious purpose of the statute, see N.M. Stat. Ann. § 66-7-318(A).  Those heuristics are reasonable approximations of how to avoid a collision and are reasonable tools to use, even if the Court were to construe them as mistakes of law.  Therefore, even if Radasa's five-second rule were considered a mistake of law, it would be a reasonable one, and a reasonable mistake of law does not defeat reasonable suspicion.  See Heien, 135 S. Ct. at 536 ("Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground.").[10]

## C.    RADASA'S SUBJECTIVE INTENT IN INITIATING THE TRAFFIC STOP IS IRRELEVANT.

Finally, Phongprasert contends that the traffic stop was pretextual, because "the officers actually possessed reasons other than those asserted for stopping Mr. Phongprasert's vehicle."  Motion at 5.  This argument lacks a sound basis in the applicable law.  It is "irrelevant that the officer may have had other subjective motives for stopping the vehicle.  Our sole inquiry is

---

[10]The Court notes that, if the five-second rule were considered an objectively unreasonable mistake of law, it would defeat reasonable suspicion.  See Heien, 135 S. Ct. at 536.  Consequently, the Court would have to suppress.  See Heien, 135 S. Ct. at 536.

whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." United States v. Botero-Ospina, 71 F.3d at 787 (internal quotation marks omitted).  See United States v. Polly, 630 F.3d 991, 997 (10th Cir. 2011).  For these reasons, the Court concludes that Radasa had reasonable suspicion that Phongprasert was violating a traffic law and validly initiated the traffic stop.

## II.    RADASA'S VIN INSPECTION DOES NOT VIOLATE THE FOURTH AMENDMENT.

The Court concludes that Radasa's VIN inspection of Phongprasert's vehicle does not violate the Fourth Amendment.  Generally, a police officer may prolong a traffic stop to check a vehicle's VIN.  See United States v. Chavira, 467 F.3d 1286, 1289 n.1 (10th Cir. 2006).  Regarding a VIN inspection's logistics, the Tenth Circuit has explained:

> In [United States v.]Caro,[248 F.3d 1240 (10th Cir. 2001),] we held that "where the dashboard VIN plate is readable from outside the passenger compartment, that VIN matches the VIN listed on the registration, and there are no signs the plate has been tampered with, there is insufficient cause for an officer to extend the scope of a detention *by entering a vehicle's passenger compartment* for the purpose of further examining any VIN." 248 F.3d at 1246 (emphasis added). In light of this holding and the Supreme Court's reasoning in [New York v.] *Class,* we believe it is clear that *Caro* applies only when (1) the officer has verified the dashboard or doorjamb VIN from outside the passenger compartment and (2) the officer nevertheless physically enters the passenger compartment to check the VIN. There is no unlawful detention under *Caro* if the officer remains physically outside the car when he examines the VIN on the dashboard, the doorjamb, or both.

United States v. Chavira, 467 F.3d at 1289 n.1 (emphasis in original)(alterations added).[11]

Phongprasert "argues that Officer Radasa's entry into the driver's side of his vehicle to allegedly

---

[11]The Court disagrees with the Supreme Court's and the Tenth Circuit's VIN jurisprudence.  Justice Ginsburg stated in Rodriguez v. United States that a traffic stop "may last no longer than is necessary to effectuate th[e stop's] purpose."  135 S. Ct. at 1614.  This statement is rooted in prior cases such as Florida v. Royer, 460 U.S. 491, 500 (1983), and Illinois

v. Caballes, 543 U.S. 405, 407 (2005).  Although the Supreme Court and the Tenth Circuit have held that: (i) a police officer can detain a motorist only as long as necessary to complete the tasks that justified the stop; and (ii) as a general principle, a Terry stop cannot exceed the stop's reason's scope, see Rodriguez v. United States, 135 S. Ct. at 1614, the Supreme Court and the Tenth Circuit over the years have incrementally added a plethora of permissible tasks, including VIN inspections, that a police officer may perform within the stop context.  Jurisprudential tension exists, because, on the one hand, officers must take no more time than necessary to perform tasks related to the stop, but, on the other hand, the tasks related to the stop are innumerable.  In effect, the rule of "no longer than [] necessary" has been butchered beyond recognition.  Rodriguez v. United States, 135 S. Ct. at 1614.

For example, if a patrol officer stops a motorist for speeding, it is unclear why the patrol officer can ask to see the motorist's registration or insurance card.  If the patrol officer only has probable cause to investigate the speeding infraction, the patrol officer must, when examining the registration and insurance, be investigating whether the motorist violated any other traffic code provisions, such as those that require a motorist to have a valid driver's license and automobile insurance.  The same is true for VIN inspections.  If a patrol officer pulls a motorist over for following another vehicle too closely, as Radasa did, the VIN -- a static number -- provides no information related to the distance between two vehicles.  The only reason a patrol officer would examine a VIN is to detect whether the vehicle is stolen.  Whether a patrol officer checks a motorist's license and registration, or rubbernecks inside the driver's door to check the doorjamb VIN sticker, these actions take time and are unrelated to the investigation whether the motorist violated a speeding or following-too-closely statute.  Nevertheless, Rodriguez v. United States does not find that such actions extend the traffic stop longer than is necessary.  See Rodriguez v. United States, 135 S. Ct. at 1613.  In effect, Justice Ginsburg's limiting language in Rodriguez v. United States accomplishes little.

The Tenth Circuit has wrestled with the tension internal to Rodriguez v. United States multiple times in an attempt to pin down what precisely constitutes an unconstitutional extension of a traffic stop.  See, e.g., United States v. Williams, 271 F.3d 1262 (10th Cir. 2001); United States v. Holt, 229 F.3d 931 (10th Cir. 2000).  In an opinion later vacated on rehearing en banc, the Tenth Circuit, in a decision that Judge Briscoe wrote and Judge McKay joined -- but from which Judge Ebel dissented -- questioned whether inquiries about a driver's travel plans relate to a stop's purpose.  See United States v. Holt, 229 F.3d at 936.  The Tenth Circuit stated in its decision that "none of the [Tenth Circuit's previous] decisions explore or explain why it is constitutionally permissible for an officer to ask [a] detainee about his or her travel plans if the questioning is unrelated to the purpose of the stop."  United States v. Holt, 229 F.3d at 936 (citing United States v. Kopp, 45 F.3d 1450, 1454 (10th Cir. 1995)(acknowledging that officer asked detainee questions about his travel plans); United States v. McSwain, 29 F.3d 558, 561 (10th Cir. 1994)(stating that "an officer conducting a routine traffic stop may inquire about 'identity and travel plans'")(quoting United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989)); United States v. Rivera, 867 F.2d at 1263 (holding that it was permissible for an officer to "ask questions relating to . . . identity and travel plans")).  The Tenth Circuit nevertheless distinguished its former decisions allowing travel-related questions and the case at issue, where the officer questioned whether the motorist's vehicle contained loaded weapons, and the Tenth Circuit appears to have segregated travel-related questions in a different category.  See 229 F.3d

at 936. After a rehearing en banc, the Tenth Circuit vacated the decision. See <u>United States v. Holt</u>, 264 F.3d 1215, 1217-18 (10th Cir. 2001)(en banc), <u>vacating</u> 229 F.3d 931 ("<u>Holt II</u>").

In later describing <u>Holt II</u>, the Tenth Circuit reaffirmed its prior notion that travel-related questions are within a traffic stop's scope. It therewith contradicted <u>Holt I</u>'s assertion that the Tenth Circuit had not directly addressed the issue, stating:

> When directly confronted with the issue, we have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop. *See West*, 219 F.3d at 1176 (stating that "questions about travel plans are routine and 'may be asked as a matter of course without exceeding the proper scope of a traffic stop'")(quoting *United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir. 1996)); *see also United States v. Santana-Garcia*, 264 F.3d 1188, 1192-93 (10th Cir. 2001)(quoting *West*, 219 F.3d at 1176); *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989); *United States v. Hill*, 195 F.3d 258, 268 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 . . . (2000); *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 . . . (2000). Though such questions <u>do typically fall within the scope of a traffic stop</u>, citizens' legitimate privacy interests are protected in that they are not legally obligated to answer such questions, nor can an officer compel an answer to these routine questions. *See United States v. $404,905.00*, 182 F.3d at 647 n.2 (citing *Terry* [<u>v. United States</u>], 392 U.S. at 34 [ . . . ](White, J., concurring)). In addition, a motorist's refusal to answer routine questions may not furnish a basis for arrest, "although it may alert the officer to the need for continued observation." *Terry* [<u>v. United States</u>], 392 U.S. at 34 [ . . . ](White, J., concurring).

<u>United States v. Williams</u>, 271 F.3d at 1267 (emphasis added)(alterations added). After clarifying that travel-related questions are within a traffic stop's scope, the Tenth Circuit concluded that "the officer's questioning regarding [the motorist's] travel plans was within the scope of the traffic stop." 271 F.3d at 1267.

The Court believes that many of the tasks that the Supreme Court and the Tenth Circuit allow are inconsistent with the Constitution and that the federal courts should be cautious about allowing too many unnecessary tasks. The Court would hold that officers should take no longer than necessary to investigate the particular reason for a given traffic stop unless: (i) the patrol officer has reasonable suspicion or probable cause to investigate other crimes; or (ii) the motorist gives consent. The Court would be hard-pressed to conclude that a patrol officer routinely should be permitted to check a motorist's registration and insurance, inspect a stopped vehicle's VIN, or barrage a motorist with travel-related questions after writing a ticket or handing back papers, without reasonable suspicion or consent. A traffic stop should not be an excuse to investigate every possible crime in the American corpus juris.

At the oral argument for <u>Rodriguez v. United States</u>, the Honorable Antonin Scalia, then-Associate Justice of the Supreme Court, also questioned why checking a driver's license, asking travel-related questions, and determining whether a car is stolen "are embraced within the mission [of a traffic stop for a broken taillight] when the only basis for the stop is you have a broken taillight." Transcript of Oral Argument at 9, <u>Rodriguez v. United States</u>, 135 S. Ct. 1609 (2015)(No. 13-9972)("<u>Rodriguez</u> Tr."); <u>id.</u> at 10 ("It's a broken taillight. That's the only thing

check the VIN number violated his Fourth Amendment rights." Supp. Mem. at 8. Phongprasert continues that "[o]pening the driver's side door and partially entering the driver's compartment with his upper body is not permissible under the Fourth Amendment." Supp. Mem. at 8. The Court has reviewed the Video and concludes that Radasa remained physically outside of Phongprasert's vehicle when he inspected the VIN inside the doorjamb. See FOF ¶ 39, at 8; Video at 8:38-8:49. The Court appreciates that the Video's angle is not the most clear, and the incident occurs over only a few seconds. Nevertheless, here is what the Court -- in making findings of fact by a preponderance of the evidence[12] -- concludes happened. When Radasa checked the VIN, he first opened the vehicle's driver's side door. See FOF ¶ 33, at 7; Video at

---

that comes within the traffic stop. All the rest is added on."). The Honorable Samuel Alito, Associate Justice of the Supreme Court, similarly asked why "adding any time to the stop in order to do a records check is part of the mission but the dog sniff is not." Rodriguez Tr. at 21. Justice Scalia concluded that courts are "willing to expand the mission to everything up to but not beyond the dog sniff." Rodriguez Tr. at 10.

The Court ultimately held, regarding "whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop," Rodriguez v. United States, 135 S. Ct. at 1612, that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." Rodriguez v. United States, 135 S. Ct. at 1612 (internal quotation marks omitted)(alterations in original). Justice Alito noted in dissent, however, that such a rule "is unlikely to have any appreciable effect on the length of future traffic stops. Most officers will learn the prescribed sequence of events even if they cannot fathom the reason for that requirement." Rodriguez v. United States, 135 S. Ct. at 1625 (Alito, J., dissenting).

The Court shares Justice Scalia's and Justice Alito's skepticism toward the current state of the law on this issue, convinced that the police should accomplish the narrow task set related to the stop and let the driver go, rather than using a traffic stop to investigate for more crimes, unless there is reasonable suspicion or consent. The Court is, however, a district court, and Supreme Court and Tenth Circuit precedent binds it. Even if the Court wishes that Justice Ginsburg's statement that a stop "may last no longer than is necessary to effectuate th[e stop's] purpose," 135 S. Ct. at 1614, had more teeth, the Court as a district court cannot ignore Supreme Court and Tenth Circuit cases.

[12]According to the Supreme Court, "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." United States v. Matlock, 415 U.S. 164, 177 n. 14 (1974).

8:38-8:40.  He then looked toward the bottom right part of the door frame to check the VIN sticker.  See FOF ¶ 34, at 7; Video at 08:39-08:44.  See also Tr. at 21:8-11 (Radasa)("I'm verifying the federal sticker which is inside the door on the door frame or on the door depending on what type of vehicle it is.").  Radasa then briefly moved closer to the vehicle's doorway before stepping back and closing the door.  See FOF ¶ 35, at 7; Video at 8:45-8:49.  During this time, Radasa's back and hat remain visible in the Video, and are outside the doorway.  See FOF ¶ 36, at 8; Video at 8:45-8:49.  On these facts, the Court concludes that Radasa "remain[ed] physically outside the car when he examine[d] the VIN."  United States v. Chavira, 467 F.3d at 1289 n.1 (alterations added).  Radasa therefore did not violate the Fourth Amendment.  See United States v. Chavira, 467 F.3d at 1289 n.1.

Even if, however, the Court were to hold that Radasa did not remain physically outside the vehicle, suppression would still not be appropriate.  In United States v. Chavira, the United States conceded that a VIN search was unlawful, but argued that the defendant "cannot rely upon the fruit of the poisonous tree doctrine because he has failed to demonstrate a nexus between the inspection of the VIN located on the doorjamb and the evidence he now seeks to suppress."  467 F.3d at 1291.  The Tenth Circuit agreed, holding that evidence "will not be suppressed as fruit of the poisonous tree unless an unlawful search is at least the but-for cause of its discovery."  467 F.3d at 1291 (emphasis in original).  Therefore, "a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."  467 F.3d at 1291 (quotation marks omitted).  Phongprasert would thus have to show that the methamphetamine in his car would not have been found but for Radasa not remaining physically outside the vehicle during the VIN inspection.  See 467 F.3d at 1291.  Because there is no evidence in the record for such a proposition, even if

the Court found that Radasa physically entered the vehicle, suppression would not be appropriate.

Finally, Phongprasert contends that, when Radasa opened the vehicle's door to check the VIN, he was really "peering into the driver's side of the vehicle, appearing to visually search the vehicle." Supp. Mem. at 8. The Video shows that Radasa looked briefly into Phongprasert's vehicle. See FOF ¶ 37, at 8; Video at 8:46-8:50. No evidence in the record, however, suggests that this brief look was the but-for cause of finding the methamphetamine. See United States v. Chavira, 467 F.3d at 1291. In fact -- apart from seeing the VIN -- there is no evidence in the record indicating what Radasa saw. See FOF ¶ 38, at 8. Because Phongprasert has not shown but-for causation, the Court will not suppress the methamphetamine.

## III. PHONGPRASERT VALIDLY CONSENTED TO RADASA'S AND AGUIRRE'S VEHICLE SEARCH.

The Court concludes that Phongprasert validly consented to Radasa's and Aguirre's vehicle search. Two events occurred leading to this result. First, the traffic stop ended, and the situation became a consensual encounter. Second, Phongprasert voluntarily signed a consent-to-search form.

### A. THE TRAFFIC STOP ENDED AND BECAME A CONSENSUAL ENCOUNTER.

As the Tenth Circuit has held, "a traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." United States v. Chavira, 467 F.3d at 1290 (internal quotation marks omitted). "Once the officer has returned the driver's documents, further questioning amounts to an unlawful detention only if the driver has objectively reasonable cause to believe that he is not free to leave." United States v.

Chavira, 467 F.3d at 1290. "[T]he return of documents is not sufficient to transform a detention into a consensual encounter if the totality of the circumstances gives the driver an objectively reasonable basis to believe he is not free to go." United States v. Chavira, 467 F.3d at 1290-91. "Such a reasonable belief may be supported by the presence of more than one officer, the display of a weapon, the physical touching of the detainee, the officer's use of a commanding tone of voice, and the officer's use of intimidating body language." United States v. Chavira, 467 F.3d at 1291.

Here, after Radasa issued the citation, he told Phongprasert that Phongprasert was free to leave. See FOF ¶ 44, at 8; Tr. at 11:1-6 (Han, Radasa). Radasa also returned Phongprasert's vehicle registration, driver's license, and proof of insurance to Phongprasert. See FOF ¶ 45, at 8; Tr. at 11:7-11 (Han, Radasa). Indeed, Phongprasert understood that he was free to leave, because he then walked away from Radasa and toward his own vehicle. See FOF ¶ 46, at 8; Tr. at 11:12-21 (Han, Radasa). As Phongprasert walked toward his vehicle, Radasa called out to him "Sir!" FOF ¶ 47, at 9; Tr. at 11:24 (Radasa). Phongprasert then turned and walked toward Radasa. See FOF ¶ 48, at 9; Tr. at 12:1-3 (Radasa). Radasa then stated that he knew that he had told Phongprasert he was free to leave, but inquired whether he could ask Phongprasert more questions. See FOF ¶ 49, at 9; Tr. at 45:16-18 (Johnson, Radasa). Phongprasert replied that Radasa could ask him more questions. See FOF ¶ 50, at 9; Tr. at 12:6-8 (Han, Radasa)("[H]e advised that I could ask more questions.").

Although more than one officer -- Radasa and Aguirre -- was present, there is no evidence in the record that the officers displayed their weapons, physically touched Phongprasert, or used intimidating body language. See FOF ¶ 52, at 9; United States v. Chavira, 467 F.3d at 1291. Further, Radasa's tone was not commanding. See FOF ¶ 51, at 9; Video at

11:00-11:30.  Finally, Radasa told Phongprasert that Phongprasert was free to leave, see FOF ¶ 44, at 8; Tr. at 11:1-6 (Han, Radasa), and Phongprasert demonstrated that he understood that he could leave by walking away from Radasa and toward Phongprasert's vehicle, see FOF ¶ 46, at 8; Tr. at 11:12-21 (Han, Radasa).  Based on the totality of the circumstances, the Court concludes that Phongprasert had an objectively reasonable basis to believe that he was free to leave.  See United States v. Chavira, 467 F.3d at 1290-91.  Radasa's traffic stop therefore became a consensual encounter, "and thus [Phongprasert's] subsequent consent to search was not the product of an unlawful detention."  United States v. Chavira, 467 F.3d at 1291 (alteration added).

### B. PHONGPRASERT VOLUNTARILY CONSENTED TO THE VEHICLE SEARCH.

The Court concludes that Phongprasert voluntarily consented to the vehicle search. "For consent to be valid, two conditions must be met: '(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied.'"  United States v. Guerrero, 472 F.3d at 789 (quoting United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992)). "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal.  Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d at 789-90.  "The second prong, requiring that the consent be free of coercion, turns on whether a reasonable person would believe he was free to leave or to deny the officer's request to search."  United States v. Guerrero, 472 F.3d at 790.  In evaluating this prong, the Tenth Circuit considers several factors, including

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory;

prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

United States v. Guerrero, 472 F.3d at 790 (quoting United States v. Sanchez, 89 F.3d at 718).

Here, Radasa asked Phongprasert if he could search Phongprasert's vehicle, see FOF ¶ 54, at 9; Tr. at 46:9-10 (Johnson, Radasa), and Phongprasert verbally agreed to allow the search, see FOF ¶ 55, at 9; Tr. at 13:20-14:1 (Han, Radasa). Further, Phongprasert completed and signed the Consent Form. See FOF ¶ 57, at 10; Tr. at 14:4-9 (Radasa); Consent Form at 1. The Consent Form states:

I, Nathan Phongprasert, hereby grant my consent to William Radasa Officer[] of the New Mexico Department of Public Safety, to search the following vehicle described below including luggage, containers, and contents therein. If [the] search reveals a false or altered compartment, access to such compartment will be made by any means available, including drilling and/or cutting of compartments

. . . .

I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

FOF ¶ 59, at 10; Consent Form at 1 (alterations added). Additionally, Aguirre asked Phongprasert if he read and understood the Consent Form, and Phongprasert said that he read and understood it. See FOF ¶ 66, at 11; Tr. at 22:20-23:7 (Han, Radasa). On these facts, the first prong is satisfied, because Phongprasert's consent is clear. See United States v. Guerrero, 472 F.3d at 789-90.

Regarding the second prong, six of the eight factors that the Tenth Circuit considers indicate that Phongprasert freely gave his consent to the vehicle search. See United States v. Guerrero, 472 F.3d at 790. Radasa did not brandish his weapon, see FOF ¶ 60, at 10; Tr. at 15:6-

22 (Han, Radasa), he did not raise his voice, other than projecting it over the I-40 traffic noise, see FOF ¶ 61, at 10; Tr. 15:17-20 (Han, Radasa), and he did not retain Phongprasert's personal effects, but, rather, returned them before seeking consent to search the vehicle, see FOF ¶ 45, at 8; Tr. at 11:7-11 (Han, Radasa). Further, nothing in the record indicates that the officers physically touched Phongprasert or asked him to accompany them to the police station. See United States v. Guerrero, 472 F.3d at 790. Finally, the entire incident did not occur in "a nonpublic place or a small, enclosed place," United States v. Guerrero, 472 F.3d at 790; rather, it occurred on the side of a public highway, see FOF ¶ 22, at 6; Tr. at 5:15-16 (Han, Radasa).

Conversely, two of the eight factors indicate a lack of voluntary consent. Multiple officers were present, see FOF ¶ 3, at 4; Tr. at 16:5-9 (Han, Radasa), and there was an "absence of other members of the public," United States v. Guerrero, 472 F.3d at 790. On balance, however, the former six factors heavily outweigh the latter two, indicating that "consent was given without duress or coercion, express or implied." United States v. Guerrero, 472 F.3d at 789. For these reasons, the Court concludes that Phongprasert voluntarily consented to the vehicle search.

Phongprasert argues that his consent was involuntary, because he could not revoke it. See Supp. Mem. at 10.[13] Specifically, he contends that the Consent Form did not advise him that he could revoke his consent and that the officers told him to stand fifteen feet away from the

---

[13]It is unclear if Phongprasert also argues that his consent was involuntary, because he was not advised that he could refuse consent. To the extent that Phongprasert makes such an argument, it lacks merit. Phongprasert was clearly advised that he could refuse consent. He signed a consent form stating: "I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form." FOF ¶ 59, at 10; Consent Form at 1. Further, Aguirre asked Phongprasert if he read and understood the Consent Form, and Phongprasert said that he read and understood it. See FOF ¶ 66, at 11; Tr. at 22:20-23:7 (Han, Radasa).

vehicle while they searched it, thereby denying him the right to revoke consent.  <u>See</u> Motion at 12; Supp. Mem. at 10.  This argument is not sound.  First, Phongprasert does not cite any authority for the proposition that a police officer must tell a defendant that he has the right to revoke consent after giving it, and the Court is aware of none. Second, although Radasa and Aguirre told Phongprasert to stand about fifteen feet away from Phongprasert's vehicle, and to stay there, while they searched it, <u>see</u> FOF ¶ 67, at 11; Tr. at 48:23-49:2 (Johnson, Radasa), Radasa also told Phongprasert that, if he needed anything, he could yell at the officers, <u>see</u> FOF ¶ 68, at 11; Tr. at 48:18-20 (Johnson, Radasa).  In other words, if Phongprasert had wanted to revoke his consent, he could have simply called out to the officers.  The Court notes, however, that nothing in the record indicates that Phongprasert ever wanted or attempted to revoke his consent.  <u>See</u> FOF ¶ 64, at 11; <u>United States v. Guerrero</u>, 472 F.3d at 790 ("[N]either Defendant objected during the search itself, which, while not dispositive, is often a good indicator that consent existed.").

At most, that the Consent Form did not say that Phongprasert could revoke consent and that the officers told him to stand back while they searched the vehicle are factors in determining whether, under "the totality of the circumstances," Phongprasert's consent was voluntary. <u>United States v. Guerrero</u>, 472 F.3d at 789.  Given that the six factors discussed above all indicate voluntariness, the Court is not persuaded that these facts prove the opposite.  If Phongprasert had wanted to verbally revoke his consent, he could have, and there is no indication that he wanted to do so.  <u>See</u> FOF ¶ 64, at 11.  The Court therefore concludes that Phongprasert validly consented to the vehicle search.  Accordingly, the Court will deny the Motion.

**IT IS ORDERED** that the requests in Defendant Nathan Phongprasert's Motion to Suppress Evidence as a Result of an Unlawful Seizure and Arrest and Memorandum in Support Thereof, filed August 16, 2017 (Doc. 23), are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
  United States Attorney
Samuel A. Hurtado
Edward Han
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

*Attorney for the Defendant*